THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
KEVIN CARR, Defendant-Appellant.

First District (1st Division)   No. 85—0748

Opinion filed November 17, 1986.

James J. Doherty, Public Defender, of Chicago (R.H.R. Silvertrust, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry and Renee Goldfarb, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE QUINLAN delivered the opinion of the court:

Defendant, Kevin Carr, was charged by information with the offenses of armed robbery and armed violence in violation of sections 18—2(a) and 33A—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, pars. 18—2(a), 33A—2). During the trial, the court granted the State's motion to *nol-pros* the armed-violence charge. The jury found the defendant guilty of armed robbery. The defendant's motion for a new trial was subsequently denied, and the trial court sentenced the defendant to eight years' imprisonment.

Defendant appeals and contends: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial court deprived him of his right to present a defense when it prevented him from introducing exculpatory statements of a State witness; (3) the prosecutor's personal attacks on defense counsel during the State's rebuttal argument deprived him of a fair trial; (4) the trial court erroneously instructed the jury on the issue of accountability; and (5) the trial court imposed an excessive sentence.

We affirm.

The victim, Gilda Cunningham, testified for the State at the defendant's trial. She testified that on March 13, 1984, at approximately 7:30 p.m., she was driving east on 42nd Street in Chicago with her two children on her way to choir rehearsal at the Mount Carmel Mission Baptist Church, located at 740 East 42nd Street. As she neared the church, Cunningham spotted two men, whom she said were approximately 15 feet away as she passed them in her car. She stated that she parked her car on the street, and, as she began to help her children out of the car, the two men approached and one walked behind her and grabbed her shoulders. The victim stated that the other man stood in front of her, held a gun close to her face, and asked her for her money.

Cunningham stated that, while it was dark at the time, there was sufficient light to see. She stated she was near a street light and that

there were lights on both sides of the street, including the church lights. She also said that the man with the gun stood only about 1 foot away from her. In her testimony, Cunningham described the man with the gun in the following manner: he wore a beige jacket, had a scar on his forehead, was approximately 5 feet 8 inches tall, weighed approximately 160 pounds, and had a medium complexion. She identified the defendant in court as that man. She described the defendant's accomplice as wearing a dark jacket, approximately 5 feet 5 inches tall, weighing approximately 140 pounds, and having a light complexion.

Cunningham further testified that when the defendant asked for her money, she gave him her purse, which, she stated, contained at that time identification cards, credit cards, and approximately $25. Cunningham said she asked the defendant if she could keep her identification cards, but the defendant told her to shut up and to walk toward the church as if nothing had happened. She stated that the defendant and the other man then ran south. Cunningham ·said the robbery lasted a few minutes.

Gilda Cunningham then walked into the church and told her aunt and the pastor's wife about the robbery, and the pastor's wife called the police. Two uniformed police officers arrived in about 15 minutes and took the victim's statement. The police then drove the victim and another choir member, Alice Stapleton, who had seen the robbers fleeing from the scene, through the neighborhood in search of the robbers. They entered a tavern, the Regency Lounge, located around the corner from the church, and, according to Cunningham, she spotted the defendant playing a video game in the front of the lounge and identified him as the robber. The police then arrested the defendant, who was wearing a beige jacket.

On cross-examination Cunningham admitted that, when she first saw the two men on 42nd Street who she said robbed her, they had their backs to her. She also did not remember telling the police officers that the man wearing the beige jacket stood behind her, and, additionally, she denied telling the police that the man wearing the dark jacket held the gun and took her purse.

The State also presented the testimony of Sheila Marshall. Marshall testified that she was coming out of a friend's house located at 722 East 42nd Street when two men walked by. She walked behind the men, who then crossed the street and approached the victim, who at that time was getting out of her car. When Marshall was asked what she saw those men do, Marshall answered, "They were sticking her up I guess." However, she admitted that she did not see a gun

and was not aware that the victim was being robbed at the time. Marshall, herself, walked past the victim after the two men had left and merely said "Hi" to Cunningham as she passed. She identified the defendant in court as one of the men she saw with the victim.

Marshall said that she went to the Regency Lounge for a few minutes after walking past the victim. She testified that she then went to the church where she learned that two men had robbed Cunningham. By that time, the police had the defendant in custody, and Marshall testified that she walked up to the squad car, saw the defendant in custody, and stated that he was the one whom she saw rob Cunningham. Marshall admitted on cross-examination that, at the scene, she did say that that was the jacket the robber had on, but she claimed she also had stated that the defendant was one of the men.

Marshall also testified that she spoke to the defendant at a carnival in June 1984. She testified that the defendant asked her for her address, but she refused to give it to him. Nevertheless, Marshall said the defendant later made an uninvited appearance at her home on December 15, 1984, and asked Marshall to go to court with him. Marshall told the defendant that she could not go, and, instead, Marshall gave him a note wherein she stated that the defendant was not one of the men who robbed Cunningham. However, Marshall said that, even though her mother and brother were home at the time, she was afraid of the defendant and wanted him out of her house and she gave him the note only to get rid of him. She admitted on cross-examination that she never mentioned the visit to the State's Attorney. Furthermore, Marshall admitted that she attended the defendant's preliminary hearing but denied talking to anyone there.

Alice Stapleton also testified for the State. She testified that, at the time in question, she was walking to the church for choir rehearsal and saw two men running. She saw the two men for only a second and from a distance of approximately 75 to 80 feet. In court, however, Stapleton was able to describe the clothing of those men, stating that one wore a beige cloth jacket, dark pants, and white gym shoes; the other wore a dark leather jacket, dark pants, and white gym shoes. Stapleton was also present in the tavern when the victim identified the defendant. She stated that the defendant was wearing a black cap in the tavern and that he was leaning over a video game, as if hiding, but not playing the game when they entered. According to Stapleton, the victim asked if the defendant looked like the guy, and she testified that she responded that the defendant did have on the same clothing and gym shoes. Stapleton stated that the victim then said, " 'Yes, that is him because I notice his face.' "

Michael Cox also testified for the State. Cox, a Chicago police officer, testified that, on March 13, 1984, he and his partner, Herman Hollister, received a report of a robbery at 740 East 42nd Street and proceeded to that address. Upon his arrival at the scene, Cox interviewed the victim, who described her assailants to him. According to Cox, the victim said that the man with the gun wore a beige jacket. However, Cox did not remember the victim mentioning a scar. Cox testified that he also interviewed Alice Stapleton, who gave him a description of the clothing that the robbers wore. Thereafter, Cox stated that he and his partner toured the neighborhood with the victim and Stapleton in an attempt to locate the offenders. Cox stated that, upon entering the Regency Lounge, the victim identified the defendant as one of the men that robbed her.

Defense counsel cross-examined Cox about the police report he made out after the robbery in which Cox referred to the offenders by number. While the narrative in the police report indicated that offender number one had the gun, on the other hand, the offender described on the first line of the report wore the dark leather jacket and the offender described on the second line wore the beige jacket. Cox testified, however, that the manner in which he listed offenders at the beginning of a report does not necessarily correspond with the manner in which he numbers offenders in the narrative. Further, Cox admitted that there was no indication in his report that offender number one in the narrative was not the first offender listed on the report.

The defendant testified that, on the night of the robbery, he was wearing a beige jacket, rust colored pants, white gym shoes, and a Cubs cap. The defendant stated that he went to Sharon White's apartment that evening around 7 p.m. because White had promised to lend him $5. He said White gave him $10 and asked him to get change. The defendant testified that he then left White's apartment at 7:45 p.m. and went to the Regency Lounge to get change. The defendant said that, at the lounge, he talked to the owner of the Regency Lounge, Gerald Hawkins, and Hawkins' landlady, Justina Sago. He stated that Hawkins could not give him change for the $10 bill, but, instead, Hawkins gave him a quarter so he could play one of the video games in the front of the lounge.

The defendant further testified that he was at the lounge for approximately five minutes before the police arrived. However, after his arrest, he told an assistant State's Attorney that he had been in the lounge for only one minute before the police arrived. The defendant testified that he was playing a video game when the police entered the lounge with two women. According to the defendant, one of the

police officers asked the women, " 'Look around. Do you see any-body,' " and one of the women responded, " 'I don't recognize any-body in here.' " The defendant stated that police officer Hollister then pointed at him and said, " 'doesn't he fit our description,' " but that Mrs. Cunningham looked unsure, as if she wanted to say, "Maybe that is him." The defendant testified that Hollister then said, " 'Well, he fits our description,' " took the defendant outside, arrested him, and transported him to the church. The defendant also stated that, when Sheila Marshall came up to him in front of the church, she said, " 'That is the jacket,' " nothing else.

The defendant gave a different version of his conversation with Sheila Marshall at the carnival in June 1984. He said that he spoke with Marshall and that Marshall said he looked familiar but did not know why. The defendant said that, after he explained to her that she was present at his preliminary hearing, Marshall said, " 'Yeah. I re-member you. I told your brother you wasn't the one who did it. The guy was much taller than you.' " The defendant said that Marshall told him that she might go to court with him, gave him her address, and told him to come over on a certain date. However, the defendant stated that he did not go to Marshall's apartment on that date.

Additionally, the defendant testified that he went to Marshall's apartment in December and asked her to go to court with him. Ac-cording to the defendant, Marshall said that she could not go to court because she had just had a baby and, instead, Marshall gave him a note wherein she stated that the defendant was not guilty. However, the defendant never showed the note to his attorney because his friend, Justina Sago, advised him not to use it. The defendant also testified that he accidentally destroyed the note by washing it with his pants; therefore, he could not and did not produce it at trial.

The owner of the Regency Lounge, Gerald Hawkins, also testified for the defense. He testified that, on the night of the robbery, the defendant was in his establishment. Hawkins stated that he thought the defendant was playing video games in the front of his lounge for approximately 15 to 30 minutes before he gave the defendant a quar-ter to play the games. However, because Hawkins was in the rear portion of the lounge, he could not state with any particularity what time the defendant entered his establishment or how long he was there before the police arrived.

Justina Sago testified for the defendant and said that she was standing outside the lounge at 8 p.m. on the night of the robbery when she saw the defendant approaching from a direction opposite the scene of the crime. She stated that the two of them talked for a

few minutes before going inside to play video games.

The defendant's brother's fiancee, Sharon White, also testified. She stated that the defendant had left her apartment at 7:45 p.m., but she admitted that she had told police detectives previously that the defendant left her apartment at approximately 8:45 p.m., but claimed that that statement was incorrect.

The State also called Chicago police officer Herman Hollister as a rebuttal witness. He testified that neither he nor his partner pointed at the defendant in the Regency Lounge, asked the two women if the defendant fit their description, or, in any way, suggested to the two women that they should identify the defendant as one of the offenders.

Thereafter, the jury returned a guilty verdict. The trial judge, as stated previously, then denied the defendant's motion for a new trial and sentenced him to an eight-year term of imprisonment.

■ In this appeal, the defendant initially contends that the State failed to prove him guilty beyond a reasonable doubt. He asserts that the evidence introduced at trial, identifying him as the armed robber, is insufficient to sustain his conviction. Specifically, the defendant asserts that the victim's ability to identify her offenders after experiencing the stress involved with being robbed at gunpoint is very questionable in the present case. He argues that the following facts support his claim that the victim did not get an adequate look at the robber to make a positive identification. He specifically notes that the victim failed to mention the defendant's facial scar to the police, told the police that the gunman wore a dark jacket, and hesitated in the Regency Lounge prior to identifying him as one of the robbers.

Furthermore, the defendant also attacks the testimony of Alice Stapleton and Sheila Marshall. He questions Stapleton's ability to see and remember, for she had no apparent reason to remember the jackets and shoes worn by the offenders, which she only observed from a distance of 80 feet. He also claims that Marshall, in fact, did not see anything since she admitted that she saw no gun, she did not see anyone holding the victim's shoulders, and she did not even know that the victim was robbed until her subsequent return to the scene. At best, he argues the victim, Stapleton, and Marshall did nothing more than make clothing identifications. As such, he concludes that their identification testimony is insufficient to sustain his conviction, and, therefore, he asserts this court should reverse his conviction citing *People v. Kincy* (1966), 72 Ill. App. 2d 419, 219 N.E.2d 662, and *People v. Thompson* (1970), 121 Ill. App. 2d 163, 257 N.E.2d 197, as authority.

The State, on the other hand, claims that it was for the jury, as the trier of fact, to assess the credibility of the witnesses, the weight to be given their testimony, and to make any inferences to be drawn from such evidence. The State asserts that the three eyewitness identifications were clear and definite, that there is more than sufficient evidence to support the conviction, and, accordingly, this court should properly affirm the defendant's conviction.

It is well settled that, where the identification of the accused is at issue, the testimony of a single credible witness is sufficient to convict if that witness viewed the accused under such circumstances as would permit a positive identification. (*People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631; *People v. Taylor* (1986), 143 Ill. App. 3d 252, 492 N.E.2d 1011; *People v. Shelby* (1984), 123 Ill. App. 3d 153, 462 N.E.2d 761.) Identification by such a witness is adequate to convict even though contradicted by alibi evidence (*People v. Taylor* (1986), 143 Ill. App. 3d 252, 492 N.E.2d 1011), or even if the identification witness' testimony contains minor discrepancies in detail, *e.g.*, the failure to mention facial hair or scars (*People v. Williams* (1986), 140 Ill. App. 3d 116, 488 N.E.2d 587). The sufficiency, weight, and credibility of an identification witness' testimony, like all other evidence introduced at trial, are matters for the jury, as the trier of fact, to decide, and its determination is not to be overturned unless the evidence of guilt is so unreasonable or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt. *People v. Shelby* (1984), 123 Ill. App. 3d 153, 462 N.E.2d 761.

■ Under the circumstances presented by the record in this case, we find that the victim had adequate opportunity to observe the armed gunman and, in addition, find the cases cited by the defendant to be inapposite to his case. In *People v. Thompson* (1970), 121 Ill. App. 2d 163, 257 N.E.2d 197, the only evidence connecting the defendant to the crime was the victim's identification. Thus, the court reversed the defendant's rape conviction because it found the circumstances surrounding the crime failed to afford the victim an adequate opportunity to observe her attacker. There, the victim was assaulted from behind, was blindfolded during the entire offense, and, additionally, failed to describe her attacker's height and weight during her direct examination. In *People v. Kincy* (1966), 72 Ill. App. 2d 419, 219 N.E.2d 662, the court reversed a robbery conviction because the victim did not testify that she saw the offender's face or that she recognized the defendant by any characteristic other than the color of his hat and coat.

We think that the situation in *People v. Bayless* (1981), 99 Ill.

App. 3d 532, 425 N.E.2d 1192, is more analogous to the defendant's case. In *Bayless* the court rejected the defendant's claims that the victim did not see the face of the offender and that identification of the defendant was based only on an identification of a straw hat. The court there found that the victim had, in fact, an adequate opportunity to observe the defendant and make a positive identification, and affirmed the defendant's conviction for armed robbery. There, during the robbery, the victim was face-to-face with his assailant for 15 seconds in an alley illuminated by street lights some 40 to 50 feet away. The victim first identified the defendant by his straw hat and the silver gun confiscated from his person, but, upon approaching the defendant, the victim identified the defendant by his facial features.

Here, the victim, Gilda Cunningham, testified that the armed assailant's face was only 1 foot away from hers during the robbery, which lasted a few minutes. There was also sufficient light in the area for the victim to see. She testified that she was near a street light, the church was lighted, and other lights on the street were on at the time of the robbery. Furthermore, according to Alice Stapleton, the victim positively identified the defendant as one of the offenders in the Regency Lounge once she saw his face.

The defendant makes additional arguments that the victim's testimony here is unreliable. He claims that the victim probably was looking at the robber's gun, not his face, that she initially described the armed offender as wearing a dark jacket, not a beige jacket, and that she failed to mention the robber's facial scar. However, these matters at best are discrepancies in detail which only affect the victim's credibility and the weight given her testimony by the trier of fact. See *People v. Taylor* (1986), 143 Ill. App. 3d 252, 492 N.E.2d 1011 (identification found reliable even though robber stuck gun in victim's mouth and cut her lip); *People v. Williams* (1986), 140 Ill. App. 3d 116, 488 N.E.2d 587 (victim's failure to mention defendant's scars and facial hair in initial description only affected weight given her testimony by trier of fact).

The defendant would have us substitute our judgment for that of the jury in this case. This we will not do. We cannot say that, with the record in this case, evidence of guilt is so lacking that no rational trier of fact could have found the defendant guilty. (See *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.) Because we find the testimony of the victim sufficient to sustain the defendant's conviction, we deem it unnecessary to review the defendant's contentions regarding the testimony of Sheila Marshall and Alice Stapleton.

■ The defendant next contends that the trial court improperly prevented him from introducing evidence that Sheila Marshall stated to one of the defendant's brothers at the defendant's preliminary hearing that the defendant did not commit the crime and, thereby, prevented him from presenting a defense. First, he claims that the trial court unduly restricted his cross-examination of Sheila Marshall, and, second, he claims that the trial court improperly prevented him from introducing the statement through the testimony of Sharon White.

During the cross-examination of Sheila Marshall, defense counsel began to question her about the defendant's preliminary hearing, but the prosecution objected. The judge sustained the objections on the basis that whether the witness was in court at the preliminary hearing and failed to testify was irrelevant and immaterial. Additionally, the trial court denied at that time defense counsel's request for a side-bar conference. The defendant argues that Marshall's statement that the defendant did not commit the crime was relevant, and the trial court's ruling, apparently based on its failure to understand the purpose of the questioning, denied him his right to confront witnesses.

It is well settled that the scope of cross-examination rests largely within the discretion of the trial court, and a court of review will not overturn its decision unless an abuse of discretion results in manifest prejudice to the defendant. See *People v. Owens* (1984), 102 Ill. 2d 88, 464 N.E.2d 261, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 297, 105 S. Ct. 362; *People v. Blakes* (1976), 63 Ill. 2d 354, 348 N.E.2d 170; *People v. Hunter* (1984), 124 Ill. App. 3d 516, 464 N.E.2d 659.

While the trial court may have been confused about the purpose of the defendant's inquiry, nevertheless, our examination of the record shows that the defendant had adequate opportunity to question Marshall about any statement she might have made at the preliminary hearing. At a later point in the cross-examination, Marshall specifically denied that she spoke to anyone at the preliminary hearing about the defendant's case or to anyone related to the defendant. After Marshall denied making any statement at the preliminary hearing, defense counsel moved on to another subject. Under the circumstances, we cannot say that the cross-examination was unduly restricted or that the defendant was prejudiced.

■ Next, during the direct examination of Sharon White, defense counsel attempted to elicit that White overheard Marshall's statement at the preliminary hearing. The prosecutor objected on the ground that the defense failed to tender the statement pursuant to the

State's discovery request. The defendant argued at trial that he was not required to tender the statement because it was the statement of the State's own witness. The judge found that the defense violated the discovery rules and sustained the objection.

A court's decision to impose a discovery sanction and exclude evidence pursuant to Supreme Court Rule 415(g) (87 Ill. 2d R. 415(g)) rests within the discretion of the trial court and will not be disturbed absent a showing of prejudice or surprise. (*People v. Winfield* (1983), 113 Ill. App. 3d 818, 447 N.E.2d 1029; *People v. La Fiura* (1981), 93 Ill. App. 3d 1099, 418 N.E.2d 48.) We agree with the State's argument and fail to see how the court's exclusion of Sharon White's testimony with respect to Sheila Marshall's prior inconsistent statement at the preliminary hearing prejudiced the defendant since the discovery violation was not drawn to the trial court's attention until after the defendant had already testified about another statement by Marshall that was identical in substance. At best, the excluded evidence is cumulative. Moreover, the record does not indicate that the defendant recently discovered the statement or that the failure to make it available to the prosecution was something other than a flagrant violation of the discovery rules. (See, *e.g., People v. Varnado* (1978), 66 Ill. App. 3d 413, 384 N.E.2d 37 (not abuse of discretion to exclude evidence in possession of defense at least one week prior to trial but not made available to prosecution).) On the contrary, the defendant's only reason for not tendering the statement to the prosecution was because it was the statement of the State's own witness. However, the discovery violation related to the statement of the defendant's witness regarding impeachment of the prosecution's witness, and the defendant wanted to use the statement to support his defense. This was a violation of Supreme Court Rule 413(d)(i) (87 Ill. 2d R. 413(d)(i)). Furthermore, the trial court's sanction was narrowly tailored and did not prevent the defense from questioning White on other matters. Under these circumstances, we do not find that the trial court abused its discretion.

■ The defendant next contends that the trial court improperly instructed the jury on the issue of accountability. (See Ill. Rev. Stat. 1981, ch. 38, par. 5—2(c); Illinois Pattern Jury Instruction, Criminal, No. 5.03 (2d ed. 1981).) The defendant claims that it was error to give this instruction because the evidence did not support the instruction, accountability was not an element of the State's case, and the instruction misled the jury.

It is a well-settled rule that a jury in a criminal case should be instructed as to any theory of the case that may reasonably be inferred

from the facts. (*People v. Halliday* (1985), 139 Ill. App. 3d 500, 487 N.E.2d 993.) The prosecution, as well as the defense, is entitled to appropriate instructions which present its theories of the case to the jury if such theories are supported by the evidence. *People v. Stamps* (1982), 108 Ill. App. 3d 280, 438 N.E.2d 1282.

The defendant here was charged with the offense of armed robbery, which required the State to prove that the defendant took property from the person or presence of another by the use of force or by threatening the use of force *while armed with a dangerous weapon.* (See *People v. Ditto* (1981), 98 Ill. App. 3d 36, 424 N.E.2d 3.) At trial the State correctly argues that the defendant, by his cross-examination of both the victim and Officer Cox, raised the issue of which offender carried the gun and took the victim's purse.

In a similar case, *People v. Thomas* (1979), 72 Ill. App. 3d 28, 389 N.E.2d 1316, the court there rejected a similar defense argument, found that the evidence there was sufficient to support an accountability instruction, and affirmed the defendant's conviction. There, both the surviving victim and the defendant's confederate testified that the defendant was holding the gun when he initially approached the two victims and announced a holdup, searched the victims' purse and wallet, ordered one victim into the trunk of his automobile, and drove to the scene where the fatal shooting took place. However, despite this testimony and the fact that the defendant presented no evidence, the court found the jury to be properly instructed, apparently because the defendant's cross-examination of the State's witnesses created enough dispute as to which of the two offenders possessed the gun at the time of the shooting. Likewise, the defendant here, in addition to presenting his alibi defense, raised an issue as to which offender was armed by cross-examining the victim and Officer Cox.

■ Moreover, the defendant's cited authorities are clearly distinguishable. (*People v. Stromblad* (1978), 74 Ill. 2d 35, 383 N.E.2d 969 (jury given wrong definition of obscenity in obscenity case) and *People v. Lewis* (1969), 112 Ill. App. 2d 1, 250 N.E.2d 812 (jury not instructed on mental state required for offense charged).) Here, there was no failure by the court to instruct the jury on a fundamental issue, and, thus, the jury did not lack the necessary tools for determining whether the prosecution had proved the defendant guilty of the offense charged. Accordingly, we find, like the court found in *Thomas*, that there was sufficient evidence to support the giving of an accountability instruction.

■ Next, the defendant claims that the prosecutor's remarks during the State's rebuttal argument deprived him of a fair trial. He ar-

gues that the prosecutor attacked defense counsel personally when she accused her of smirking at the victim, laughing at the State's witnesses, and not taking the trial seriously. On the other hand, the State argues that the prosecutor's remarks were invited by defense counsel's closing argument, *e.g.*, defense counsel's reference to a certain comic strip while arguing that the State's witnesses could not have seen what they testified to having seen.

A defendant cannot complain of remarks made by the State in rebuttal which are invited by defense counsel's statements. (*People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671, *cert. denied* (1979), 442 U.S. 929, 61 L. Ed. 2d 296, 99 S. Ct. 2858.) Even if comments are in fact improper, they do not constitute reversible error unless they result in substantial prejudice to the defendant or serve no purpose except to inflame the jury (*People v. Terry* (1984), 99 Ill. 2d 508, 460 N.E.2d 746) or contribute to his conviction (*People v. Beller* (1979), 74 Ill. 2d 514, 386 N.E.2d 857).

Our examination of the record indicates that the prosecutor's remarks here were responses to defense counsel's argument, and, in light of the overwhelming evidence of the defendant's guilt, we find that the comments, in any event, did not contribute to the defendant's conviction.

■ The defendant's final contention is that his eight-year sentence is excessive because his was only a "garden variety" armed robbery where the victim was not seriously hurt. It is well settled that sentencing rests in the sound discretion of the trial court, and, accordingly, a sentence will not be altered on appeal unless the trial court abused its discretion. (*People v. Steppan* (1985), 105 Ill. 2d 310, 473 N.E.2d 1300; *People v. Williams* (1986), 140 Ill. App. 3d 116, 488 N.E.2d 587.) Thus, the question to be answered in this case is whether the trial court abused its discretion by imposing an eight-year sentence.

Armed robbery is a Class X felony which provides a 6- to 30-year sentence of imprisonment. (See Ill. Rev. Stat. 1981, ch. 38, pars. 18—2(b), 1005—8—1(a)(2).) Here, the trial judge considered the circumstances surrounding the crime. He considered that the defendant confronted the victim in the presence of her two children and held a gun to her face. However, while the judge initially considered the case warranted a sentence of 10 or 12 years' imprisonment, after he considered the mitigating factors contained in the presentence report including the defendant's military record, the judge determined less imprisonment was appropriate. Under the circumstances, we cannot say that the trial court abused its discretion by imposing an eight-year sentence.

Accordingly, for all the reasons set forth above, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

BUCKLEY and O'CONNOR, JJ., concur.